

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

DCG

*Dana Brusca*
*Assistant United States Attorney*
*Dana.Brusca@usdoj.gov*

*Mailing Address:*
*6500 Cherrywood Lane, Suite 200*
*Greenbelt, MD 20770-1249*

*Office Location:*
*6406 Ivy Lane, 8th Floor*
*Greenbelt, MD 20770-1249*

*DIRECT: 301-344-0222*
*MAIN: 301-344-4433*
*FAX: 301-344-4516*

March 17, 2021

Courtney Francik Esq.
Katherine Newberger, Esq.
Assistant Federal Public Defenders
100 S. Charges Street, Suite 1100
Baltimore, MD 21201

   Re: <u>United States v. Crystal Jones</u>

Dear Counsel:

   This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Crystal Jones (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **March 29, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offenses of Conviction</u>

   1. The Defendant agrees to waive Indictment and plead guilty to Counts One and Two of the Information to be filed against the Defendant, which will charge the Defendant, in Count One, with wire fraud, in violation of 18 U.S.C. § 1343, and, in Count Two, with willful failure to pay over employment taxes, in violation of 26 U.S.C. § 7202. The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

<u>Elements of the Offenses</u>

   2. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the date alleged in the Information, in the District of Maryland:

   a. <u>Count One—Wire Fraud</u>: (1) there was a scheme or artifice to defraud, or to obtain money or property by materially false and fraudulent pretenses, representations, or promises, as alleged in the Information; (2) the Defendant knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with the specific intent to defraud; and (3) in the execution of that scheme, the Defendant used or caused the use of the interstate wires, as specified in the Information.

Rev. August 2018

b. <u>Count Two—Willful Failure to Pay Over Employment Taxes</u>: (1) the Defendant had a duty to collect or pay over an employment tax; (2) the Defendant knew she had a duty to collect or pay over an employment tax; and (3) the Defendant willfully failed to collect or pay over an employment tax.

## Penalties

3. The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Imprisonment | Maximum Imprisonment | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1343 | N/A | 20 years | 3 years | $250,000 or twice the gross gain (or loss), whichever is greater | $100 |
| 2 | 26 U.S.C. § 7202 | N/A | 5 years | 3 years | $10,000 | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Payment: If a fine is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

d. Collection of Debts: If the Court imposes a fine, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign



a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to have a grand jury consider the charge in the Information against the Defendant. The Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be

3



admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein, and further agree that:

Count One (Wire Fraud):

a. The applicable base offense level for Count One is 7, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

b. A 16-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(I) because the aggregate actual or intended loss amount caused by the Defendant's conduct was more than $1,500,000 but not more than $3,500,000. Use of the aggregate loss to calculate the offense level is appropriate pursuant to U.S.S.G. §§ 3D1.2(d) and 3D1.3(b).

Count Two (Willful Failure to Pay Over Employment Taxes):

4

c. The applicable base offense level for Count Two is 6, pursuant to U.S.S.G. §§ 2B1.1(a)(1) and 2T1.6, because the offense involved embezzlement by withholding tax from an employee's earnings and willfully failing to account to the employee for it.

d. A 16-level increase applies, pursuant to U.S.S.G. §§ 2B1.1(b)(1)(I) because the aggregate actual or intended loss amount caused by the Defendant was more than $1,500,000 but not more than $3,500,000. Use of the aggregate loss to calculate the offense level is appropriate pursuant to U.S.S.G. §§ 3D1.2(d) and 3D1.3(b).

e. Count One (Wire Fraud) and Count Two (Willful Failure to Pay Over Employment Taxes) group pursuant to U.S.S.G. §§ 3D1.1, 3D1.2, and 3D1.3(b). As such, the total adjusted offense level for Count One and Count Two is **23**.

f. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way. The office will not oppose a request by the Defendant at sentencing that any potential sentence be served as home detention rather than incarceration.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background,

5



character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence on Count One, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

12. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of the Defendant's illegal activities, including, but not limited to: a money judgment in the amount of **at least $449,123.73 in U.S. Currency** equal to the proceeds the Defendant obtained as a result of her wire fraud offense.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture



at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

14. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Restitution

16. The Defendant agrees to the entry of a Restitution Order for the full amount of the losses suffered by the Victim Lenders and the Internal Revenue Service, as identified in Attachment A, which amount the parties agree is **at least $1,196,085.34 in U.S. currency**. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Tax Liability

17. The Defendant understands that this Agreement does not resolve any civil tax liability that the Defendant may have, and that this Agreement is with the United States Attorney's Office, not with the Internal Revenue Service. The Internal Revenue Service is not a party to this Agreement and remains free to pursue any and all lawful remedies it may have. The Defendant agrees, however, as a special condition of supervised release: (a) to execute a final and conclusive "Closing Agreement" with the Internal Revenue Service, pursuant to section 7121 of the Internal Revenue Code, in order to resolve tax liabilities for the years 2014 through 2016; (b) to provide a complete and accurate financial statement, under penalty of perjury, to the United States that shall identify all assets valued at $1,000 or more owned or held directly or indirectly by the Defendant, as well as all such assets transferred by the Defendant to any third parties since 2014, including

the location of said assets and identities of the third parties; and (c) to pay to the Internal Revenue Service all additional taxes, interest and penalties that the Internal Revenue Service may determine that the Defendant owes for the tax years 2014 through 2016, pursuant to the aforesaid Closing Agreement. The Defendant understands that a failure to comply with any of the conditions of the Defendant's supervised release may result in revocation of the Defendant's release conditions, resulting in the Defendant's re-incarceration for all or part of the term of supervised release.

### Defendant's Conduct Prior to Sentencing and Breach

18. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein.

### Court Not a Party

20. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

21. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

Dana J. Brusca
Harry M. Gruber
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

4/28/21
Date

Crystal Jones, Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

4/23/21
Date

Courtney Francik, Esq.

# ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

At all relevant times from 2013 to 2017, **Crystal JONES a/k/a Crystal Powell Jones ("JONES")** was a resident of Laurel, Maryland.

From at least 2012 to August 2017, **JONES** operated JAG Professional Resources ("JAG"), a temporary staffing agency whose primary place of business was in Howard County, Maryland. As JAG's managing partner, **JONES** exercised control over all of JAG's business affairs, including JAG's finances and a PNC bank account ending in x2006, which was opened in Maryland and held in JAG's name ("JAG PNC x2006"). **Individual 1** was a silent minority partner in JAG.

JAG generally sought contracts to provide hourly labor to state, local, and municipal governments, and agencies thereof. For example, one of JAG's clients was a municipal government, a City located in the State of Ohio ("the City in Ohio"), that contracted with JAG for the provision of temporary employment services from in or about February 2013 until in or about February 2016. The types of employees JAG provided to the City in Ohio included convention center workers, camp counselors, and golf course maintenance personnel, among others.

*Scheme to Defraud the Victim Lenders*

Victim Lender 1 was a factoring company headquartered in Illinois.

Victim Lender 2 was an automobile financing service headquartered in California.

Victim Lender 3 was a mortgage banking company headquartered in New Jersey.

Victim Lender 4 was a personal finance company headquartered in California (collectively, the "Victim Lenders").

Between at least in or about October 2012 and in or about August 2017, in Maryland and elsewhere, **JONES** devised a scheme and artifice to defraud the Victim Lenders and to obtain money from the Victim Lenders, by means of materially false and fraudulent pretenses, representations, and promises, with intent to defraud and knowledge of the scheme's fraudulent nature. In total, as a result of the scheme to defraud the Victim Lenders, **JONES** obtained at least $449,123.73 in funds.

It was part of the scheme to defraud that: (1) **JONES** misused JAG to obtain corporate and personal financing that benefitted **JONES**, her family members, and friends; (2) **JONES** created



false and fraudulent paystubs purportedly issued by JAG to obtain loans for her own benefit and the benefit of others; (3) **JONES** created false and fraudulent invoices purported to represent services that JAG had provided; and (4) **JONES** appropriated the names, signatures, and personal identifying information of **Individual 1, Individual 2,** and **Individual 3,** her close, personal relatives, for her own benefit.

During her execution of the scheme to defraud the Victim Lenders, **JONES** knowingly caused the use of the wires, including by sending emails and submitting loan applications from her home in Laurel, Maryland, and by receiving funds into bank accounts **JONES** controlled in Maryland, including as set forth below.

*Victim Lender 1 (Count One)*

From in or about February 2013 to at least October 2016, Victim Lender 1 provided factoring services[1] to JAG. That is: JAG sold its account receivables to Victim Lender 1 and, in return, JAG received from Victim 1 cash advances totaling approximately 90% of JAG's account receivables. Upon collection of the receivables (that is, upon receiving payments from JAG's clients on outstanding invoices), Victim Lender 1 sent JAG the remaining 10% of the invoices that had been purchased, less fees Victim Lender 1 charged for its factoring services.

From in or about March 2016 to in or about May 2016, **JONES** caused JAG to sell Victim Lender 1 false and fraudulent invoices totaling $417,975.39 for services that JAG had purportedly provided to the City in Ohio. In fact, JAG's relationship with the City in Ohio ended in or about February 2016. Unaware that JAG's contract with the City in Ohio had been terminated, Victim Lender 1 sent the following wire transfers, among others:

| Date | Description of Wire |
|---|---|
| 3/31/2016 | A $40,348.44 Fed Wire transfer from Victim Lender 1, which originated outside of Maryland, and which was deposited into the JAG PNC x2006 account. |
| 4/8/2016 | A $40,552.62 Fed Wire transfer from Victim Lender 1, which originated outside of Maryland, and which was deposited into the JAG PNC x2006 account. |
| 4/25/2016 | A $40,936.62 Fed Wire transfer from Victim Lender 1, which originated outside of Maryland, and which was deposited into the JAG PNC x2006 account. |
| 5/12/2016 | A $47,666.75 Fed Wire transfer from Victim Lender 1, which originated outside of Maryland, and which was deposited into the JAG PNC x2006 account. |

---

[1] Factoring is a means by which cash intensive businesses can obtain cash quickly and reliably by leveraging account receivables. JAG was a cash intensive business because it was required to pay its temporary employees weekly or biweekly, but often did not receive payment from JAG's clients until at least 30 days after services had been rendered.

11



In total, Victim Lender 1 paid at least $347,993.13 to JAG as a result of the fraudulent invoices **JONES** caused JAG to sell Victim Lender 1.

*Victim Lender 2 – Loan for **JONES**'s Car*

In or about October 2012, **JONES**, as borrower, and **Individual 1**, as co-borrower, financed the purchase of a 2012 Ford Fusion in North Carolina. To obtain financing, **JONES** completed an Applicant's Credit Statement in which **JONES** falsely represented that she had been employed by **JAG** as an accountant for four years.

**JONES** further submitted in support of her financing application a pay stub reflecting that **JONES** had earned in 2012 over $38,000 in wages year-to-date from **JAG**. **JONES** also submitted a false and fraudulent bank statement for a Bank of America account ending x0448 ("BOA x0448"). The false and fraudulent account statement that **JONES** submitted in support of her application for financing listed both **Individual 1** and **JONES** as the account holders; but, in truth and fact, **Individual 1** was the sole account holder of BOA x0448.

Subsequently, Victim Lender 2 provided **JONES** and Individual 1 with financing totaling $19,657.50 toward the purchase of **JONES**'s car. Victim Lender 2 suffered a loss of $5,422.60 on **JONES**'s car financing after **JONES** declared bankruptcy and failed to satisfy the debt.

*Victim Lender 3 – Mortgage for **JONES**'s Residence*

In or about November 2015, **JONES** financed the purchase of a single-family residence located in Laurel, Maryland ("**JONES**'s Residence"). As part of her purchase efforts, **JONES** submitted to Victim Lender 3 a Uniform Residential Loan Application in which:

a. **JONES** represented she had been employed by JAG for two years as an accountant.
b. **JONES** did not check the box indicating that she was self-employed.
c. **JONES** listed a single asset, a Bank of America bank account ending x9717 ("BOA x9717"), which **JONES** represented to have a balance of $44,425.26.

As support for her mortgage application, **JONES** submitted to Victim Lender 3 false and fraudulent bank statements for BOA x9717. The fake and fraudulent account statements that **JONES** submitted to Victim Lender 3 listed both **Individual 1** and **JONES** as the account holders; but, in truth and fact, **Individual 1** was the sole account holder of BOA x9717. The fake and fraudulent statements **JONES** submitted to Victim Lender 3 further reflected that, on October 7, 2015, BOA x9717 had a balance of $44,425.26; but, in truth and fact, on October 7, 2015, BOA x9717 had a balance of only $4,425.26.

In reliance on the false and fraudulent documents provided by **JONES**, Victim Lender 3 provided $417,302.00 in financing for the purchase of **JONES**'s Residence.



*Victim Lender 4 – Loans to **Individual 2** and **Individual 3***

In or about October 2016, **JONES** submitted and caused to be submitted from **JONES's** Residence, a loan application in the name of **Individual 2** to Victim Lender 4. The contact email address listed on the application was an email address that **JONES** controlled, and the phone number associated with the application was a phone number used by **JONES**.

In the loan application to Victim Lender 4, **JONES** represented and caused to be represented that **Individual 2** was a JAG employee who earned an annual salary of $75,000. **JONES** thereafter completed for Victim Lender 4 an employment verification form in which **JONES** represented that **Individual 2** had earned in the previous two years annual salaries of $75,000 and $68,000, respectively. Additionally, **JONES** provided to Victim Lender 4 a false and fraudulent paystub reflecting JAG had paid wages to **Individual 2** in September 2016. In fact, **Individual 2** received no wages from JAG in 2016.

In reliance on the false and fraudulent documentation provided by **JONES**, Victim Lender 4 approved the loan to **Individual 2** and wired $66,708.00 to an M&T bank account ending x8371 located in Maryland that was held in **JONES's** own name.

Similarly, in or about August 2017, at **JONES** request, **Individual 3** submitted from **JONES's** Residence a loan application to Victim Lender 4 in the name of **Individual 3**. Once again, **JONES** created and provided or caused to be provided to Victim Lender 4 false and fraudulent documentation, including paystubs and IRS Form W-2s, in which **JONES** claimed that **Individual 3** was an employee of JAG earning substantial wages. In reliance on the documentation created by **JONES**, Victim Lender 4 approved the loan to **Individual 3** and wired $40,000.00 to a Wells Fargo bank account ending x0223 ("WF x0223") held in **Individual 3's** name. **Individual 3** thereafter provided at least $29,000 of the loan proceeds to **JONES**.

*Willful Failure to Pay Employment Taxes*

From about January 2014 to October 2016, JAG Professional Resources paid wages totaling approximately $3,851,994.00 to its workers. During this period, although **JONES** was responsible for paying employment taxes to the IRS, she purposely failed to do so.

**JONES** did not maintain reliable and accurate business records relating to the operation of JAG, including with respect to its employees, payroll, and tax withholding. Particularly toward the end of its operation, JAG's employees, who were paid on an hourly basis, would complain to JAG that they had received incorrect payment for the hours they had worked. Often, the employees had not been paid for all the hours worked or not been paid at the correct rate (e.g., for overtime hours). When JAG issued wages, correct or incorrect, to its employees, it did so while purportedly withholding employment taxes (wage withholding, FICA, Social Security and Medicare) on the employees' behalf. Indeed, JAG—at **JONES's** direction—annually issued IRS Form W-2s to its employees, which reflected that wages paid to the employee had been withheld.

Nonetheless, for the 2014 to 2016 tax years, **JONES** failed to file a single IRS Form 941, an Employer's Quarterly Federal Income Tax Return. Form 941 requires employers to report the total amount of employees' wages subject to withholding, the total amount of income tax withheld,



the total amount of Federal Insurance Contributions Act or "FICA" taxes due, and the total tax deposits. Employers are required to pay over to the IRS these withheld taxes at the time of filing the Form 941, along with the employer's share of FICA taxes.

From January 2014 to October 2016, **JONES** likewise willfully failed to pay to the IRS, in all but one quarter,[2] the employment taxes (wage and FICA, i.e., Social Security and Medicare) that had been withheld from the wages paid to JAG's employees, resulting in a tax loss to the IRS of at least $523,244.38.

**JONES** likewise failed to pay for tax years 2014 to 2016 the employers share of FICA (Social Security and Medicare) taxes owed on the wages that JAG had paid, resulting in an additional tax loss to the United States of at least $447,324.68.

**JONES** further failed to pay the majority of state payroll taxes that JAG owed, and moreover failed timely to pay state unemployment and workers' compensation duties. These failures resulted in additional tax losses to the states in which JAG operated and prevented JAG's employees from collecting unemployment and worker's compensation benefits to which they may otherwise have been entitled. Indeed, on occasion, JAG withheld from employees' wages but failed to pay to the state child support payments.

\* \* \*

In all, the attempted loss resulting from **JONES's** misuse of JAG to perpetrate her scheme to defraud the Victim Lenders and the loss to the IRS for her willful failure to pay employment taxes was more than $1,500,000 but less than $3,500,000, and the actual loss was at least $1,196,085.34 ($225,516.28 to the Victim Lenders and the remainder to the United States).

\* \* \*

SO STIPULATED:

_____
Dana J. Brusca
Assistant United States Attorney

_____
Crystal Jones
Defendant

_____
Courtney Francik, Esq.
Counsel for Defendant

---

[2] For the quarter ending June 30, 2015, **JONES** made partial payment to the IRS totaling $38,364.62 for employment taxes that had been withheld from JAG's paid wages.